IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**JAAAT TECHNICAL SERVICES, LLC,**

    **Plaintiff,**

v.                          **Civil Action No. 3:15cv235**

**TETRA TECH TESORO, INC.,**

    **Defendant.**

## MEMORANDUM OPINION

This matter is before the Court on its *sua sponte* reconsideration of subject-matter jurisdiction. For the reasons that follow, the Court finds that it does not have subject-matter jurisdiction over this action. The Court will dismiss the action without prejudice.[1]

### I. Relevant Background[2]

#### A. The Contract Dispute

The dispute in this case arises from Defendant Tetra Tech Tesoro, Inc.'s ("Tesoro") alleged breach of five subcontracts regarding five construction projects at three military bases

---

[1] Because the Court finds that it lacks subject matter jurisdiction over this case, it will deny as moot the following outstanding motions: (1) JAAAT's Motion to Quash Subpoena *Duces Tecum*, (ECF No. 70); (2) Tesoro's Motion to Compel, (ECF No. 71); and, (3) Tesoro's Motion to Strike Testimony of Eddie Cummings, (ECF No. 77).

[2] The Court assumes familiarity with the facts and procedural background of this case as set forth in its Memorandum Opinion denying Tesoro's Motion to Dismiss for Lack of Subject-Matter Jurisdiction, *JAAAT Tech. Servs., LLC v. Tetra Tech Tesoro, Inc.*, No. 3:15cv235, 2016 WL 1271039 (E.D. Va. Mar. 29, 2016) (ECF No. 32) (the "March 2016 Opinion"), and its Memorandum Order denying JAAAT's Motion to Dismiss Counts 7 through 10 of Tesoro's Counterclaims, *JAAAT Tech. Servs., LLC v. Tetra Tech Tesoro, Inc.*, No. 3:15cv235 (E.D. Va. Sept. 26, 2016) (ECF No. 73) (the "September 2016 Memorandum Order").

(the "Military Base Projects").[3] At each Military Base Project, Plaintiff JAAAT Technical Services, LLC ("JAAAT") acted as the general contractor and Tesoro acted as a subcontractor. Both parties are Virginia companies. JAAAT alleges that Tesoro breached its duties under five subcontracts by "fail[ing] to adequately perform the work required" and incurring "substantial delays in the performance of its work on each project." (Am. Compl. ¶ 28, ECF No. 16.) JAAAT alleges that it has suffered damages as a result of Tesoro's breaches and seeks damages, costs and expenses, and pre- and post-judgment interest.

Tesoro filed an answer, which included ten counterclaims. Tesoro alleged its own breach of contract claims against JAAAT as to the same five subcontracts. Tesoro also included an unjust enrichment or *quantum meruit* claim (Count 6), a constructive trust or breach of fiduciary duty claim (Count 7), an accounting claim (Count 8), a conversion claim (Count 9), and a fraud claim (Count 10). In its counterclaims, Tesoro seeks damages, costs and expenses, and pre- and post-judgment interest.

Two facts are crucial to the question of subject-matter jurisdiction here. First, each of the Military Bases is a federal enclave and is therefore governed not by simple state or federal law but, as discussed more fully later, by "federalized" state law. Second, each subcontract contains a choice-of-law clause stating that "all disputes under [the subcontracts] shall be determined and interpreted pursuant to the laws of the Commonwealth of Virginia." (Am. Compl. ¶ 54.) Thus, if no enforceable choice-of-law provision governs the parties' subcontracts, federalized state law would likely govern these claims.

---

[3] The military bases at issue are: (1) Fort Bragg (located in North Carolina); (2) Fort Gordon (located in Georgia); and, (3) Fort Benning (located in Georgia) (collectively, the "Military Bases").

**B.  The Court Revisits Subject-Matter Jurisdiction Because Federal Question Jurisdiction Exists Only When Federal Law *Creates* the Cause of Action or When Plaintiff's Relief *Necessarily Depends* on the Resolution of a Substantial Federal Question**

The Court revisits subject-matter jurisdiction because federal question subject-matter jurisdiction exists when federal law *creates* the cause of action or when plaintiff's relief *necessarily depends* on the resolution of a substantial federal question. *See Aegis Def. Servs., LLC v. Chenega-Patriot Grp., LLC*, 141 F. Supp. 3d 479, 483–84 (E.D. Va. 2015) (citing *Interstate Petroleum Corp. v. Morgan*, 249 F.3d 215, 219 (4th Cir. 2001)).  Neither circumstance exists here.

As a court of limited subject-matter jurisdiction, *United States ex rel. Vuyvuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009) (citing *Exxon Mobile Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005)), this federal court must determine whether it has jurisdiction over the claims at issue, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) ("The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884))).  "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation . . . ." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (citing Fed. R. Civ. P. 12(b)(1)).  "Subject-matter jurisdiction cannot be conferred by the parties, nor can a defect in subject-matter jurisdiction be waived by the parties.  Accordingly, questions of subject-matter jurisdiction may be raised at any point in the proceedings and may (or, more precisely, must) be raised *sua sponte* by the court." *Brickwood Contractors, Inc. v. Datanet Engineering, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004) (internal citations omitted); *see also* Fed. R.

Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

Federal district courts commonly exercise jurisdiction over civil actions in two circumstances. First, federal district courts exercise jurisdiction in "federal question" cases— "civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "[I]n order for federal question jurisdiction to exist[:] (i) federal law must *create* the cause of action[;] or[,] (ii) the plaintiff's right to relief must *necessarily depend* on the resolution of a substantial federal question." *Aegis Def. Servs., LLC*, 141 F. Supp. 3d at 483–84 (emphasis added) (citing *Interstate Petroleum Corp.*, 249 F.3d at 219). Second, federal district courts exercise jurisdiction in "diversity" cases—when the parties are, *inter alia*, citizens of different states and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a)(1).

Thus, in order to exercise jurisdiction over this case, the Court must find that one of three circumstances exists—either: (1) federal law creates JAAAT's cause of action; (2) JAAAT's right to relief necessarily depends on the resolution of a substantial federal question;[4] or,

---

[4] If state law creates the cause of action, federal question jurisdiction will lie *only* if "it 'appears from the [complaint] that the right to relief depends upon the construction or application of [federal law].'" *Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313 (2005) (quoting *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 199 (1921)). This standard is met in only a "'special and small category' of cases." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (quoting *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 699 (2006)).

"In recent years, the Supreme Court has brought greater clarity to what it describes as a traditionally 'unruly doctrine,' emphasizing its 'slim contours.'" *Flying Pigs, LLC v. RRAJ Franchising, LLC*, 757 F.3d 177, 182 (4th Cir. 2014) (quoting *Gunn*, 568 U.S. at 258). Specifically, under *Grable* and *Gunn*, "federal jurisdiction over a state law claim will lie [only] if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. "Where all four of these requirements are met, . . . jurisdiction is proper because there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without disrupting Congress's intended division of labor between state and federal courts." *Id.* (quoting *Grable*, 545 U.S. at 313–14). The parties here do

4

(3) JAAAT and Tesoro are citizens of different states and the amount in controversy exceeds

$75,000. Because, given the parties' citizenship and the enforceability of their choice-of-law

provision, none of these circumstances are present, the Court lacks subject-matter jurisdiction

over this action and must dismiss it.

### C. When, as Here, Congress Fails to Enact New Civil Contract Law, the Federal Enclave Doctrine Provides that State Contract Law at Time of Cession Governs the Dispute

This apparently straightforward breach-of-contract case involves an unusual and knotty

legal issue because the Military Bases qualify as federal enclaves and, therefore, would typically

be governed by "federalized" state law. Under this doctrine, contract law in place in early 1900s

North Carolina and Georgia—the time these Military Bases were ceded—would govern this

dispute.

As this Court noted in its March 2016 Opinion, "[a] federal enclave is created when a

state cedes jurisdiction over land within its border to the federal government and Congress

accepts that cession." *Allison v. Boeing Laser Tech. Servs.*, 689 F.3d 1234, 1235 (10th Cir.

2012). The federal enclave doctrine, which grants Congress the exclusive right to regulate

properties acquired from state governments, arises from Article I, section 8, clause 17 of the

United States Constitution (the "Federal Enclave Clause"):

> Congress shall have the Power . . . *To exercise exclusive Legislation in all Cases whatsoever,* over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings . . . .

---

not contend that this case fits within the "'special and small category' of cases" contemplated by
the standard set forth in *Grable* and *Gunn*.

U.S. Const. art. I, § 8, cl. 17 (emphasis added). Under the federal enclave doctrine, when "the United States acquires with the 'consent' of the state legislature land within the borders of that State . . . the jurisdiction of the Federal Government becomes 'exclusive.'" *Paul v. United States*, 371 U.S. 245, 264 (1963). This legislative "power of Congress over federal enclaves . . . is obviously the same as the power of Congress over the District of Columbia" and "by its own weight, bars state regulation without specific congressional action." *Id.* at 263.

In the absence of subsequent federal legislation displacing state law, "the [state] law in effect at the time of the transfer of jurisdiction [from the state to United States] continues in force" on the federal enclave. *James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 100 (1940).[5] Importantly, "future statutes of the state are not a part of the body of laws in the ceded area," and "Congressional action is necessary to keep [the laws of the federal enclave] current." *Id.* at 100; *see also Paul*, 371 U.S. at 268 ("Since a State may not legislate with respect to a federal enclave unless it reserved the right to do so when it gave its consent to the purchase by the United States, only state law existing at the time of the acquisition remains enforceable, not subsequent laws."). Subsequent state common law also does not apply. *Allison*, 689 F.3d at 1240 (explaining that "[w]hen a state speaks through its courts, it creates new law no less than when it speaks through the legislature").

---

[5] The continuation of state law as federal law "assures that no area however small will be left without a developed legal system for private rights." *James Stewart & Co.*, 309 U.S. at 100. Congress has assimilated some laws, particularly criminal laws, to apply in federal enclaves. *Allison,* 589 F.3d at 1237. Congress also has allowed application of current state law to some civil claims, including wrongful death, workers' and unemployment compensation, and fish and game regulation. *Id.* "But in many important areas of law that are traditionally the responsibility of states . . . [including contract law] . . . there is no federal assimilative statute." *Id.* at 1237–38.

This circumstance rightly has drawn criticism. *See, e.g.*, Chad DeVeaux, *Trapped in the Amber: State Common Law, Employee Rights, and Federal Enclaves*, 77 Brook. L. Rev. 499, 503 (2012) ("With respect to legal areas neglected by Congress, federal enclaves have devolved into jurisprudential Jurassic Parks, 'sanctuar[ies] for the obsolete restrictions of the common law.'" (quoting *Capetola v. Barclay-White Co.*, 48 F. Supp. 797, 800 (E.D. Pa. 1943))).

6

Thus, the law in force on federal enclaves, although derived from state law, becomes exclusively federal law once the enclave is ceded to the federal government.[6] *See Pac. Coast Dairy v. Dep't of Ag. of Cal.*, 318 U.S. 285, 294 (1943); *see also Allison*, 689 F.3d at 1237 ("The central principle of [the] federal enclave doctrine is that Congress has exclusive legislative authority over these enclaves."). And as the Court discussed in its March 2016 Opinion, this so-called "federalized" state law can confer on federal courts subject-matter jurisdiction over claims that would otherwise be matters of state law, such as the contract disputes at issue here. *See* March 2016 Opinion, at *3 (citing *Allison*, 689 F.3d at 1235).

D. **This Court Erred in its March 2016 Opinion When Finding that Federal Question Jurisdiction Existed Because It Applied Tenth Circuit Dicta Without Considering Choice-of-Law Issues First**

In March 2016, the Court held, as a matter of first impression, that it had federal question subject-matter jurisdiction over the breach of contract claims at bar because federalized state law governed causes of action that arose on these federal enclaves and the parties could not "contract around" the Constitution. However, on review, the Court sees that it jumped the gun in relying on nonbinding dicta about federalized law operating as a choice-of-law doctrine from the United States Court of Appeals for the Tenth Circuit, *see Allison*, 689 F.3d at 1235, before fully analyzing, as a threshold matter, the effect of the parties' choice-of-law clause. *See Fransmart, LLC v. Freshii Dev., LLC*, 768 F. Supp. 2d 851, 858 (E.D. Va. 2011) (explaining that "the

---

[6] The Supreme Court of the United States recognizes at least three exceptions to the rule that the United States holds exclusive legislative jurisdiction over federal enclaves, none of which apply in this case:

> 1) where Congress has, by statute, provided a different rule; 2) where the state explicitly retained the right to legislate over specific matters at the time of cession; and[,] 3) where minor regulatory changes modify laws existing at the time of cession.

*Allison*, 689 F.3d at 1237.

choice-of-law question is a threshold issue"). Unlike this Court, the *Allison* court had no choice-of-law clause to evaluate in the first instance.[7]

In March 2016, the Court mistakenly began with the "longstanding position" that the federal enclave doctrine requires courts to apply federalized state law to causes of action that arise on federal enclaves. *See, e.g.*, *Stokes v. Adair*, 265 F.2d 662, 665–66 (4th Cir. 1959) (finding federal district court possessed jurisdiction over non-diverse parties for personal injuries on a federal enclave); *accord Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) (finding removal proper where tort claims allegedly occurred on a federal enclave); *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1034 (10th Cir. 1998) (finding that "[p]ersonal injury actions which arise from incidents occurring in federal enclaves may be removed to federal district court as part of federal question jurisdiction"); *Mater*, 200 F.2d at 124–25 (finding that federal courts have jurisdiction over torts committed on federal enclaves). Relying on the wide body of law supporting that position, the Court concluded that "it is undisputed that 'claims arising on a federal enclave provide a separate and independent basis for federal question jurisdiction.'" *Id.* (footnote omitted) (quoting *Federico v. Lincoln Military Hous.*, 901 F. Supp. 2d 654, 663 n.2 (E.D. Va. 2012).

Misapplying dicta from a United States Court of Appeals for the Tenth Circuit opinion, the Court stated that the "'[f]ederal enclave doctrine operates as a choice of law doctrine that

---

[7] In *Allison*, the Tenth Circuit decided a wrongful discharge claim brought by a former Boeing employee seeking to apply common law employment principles developed by New Mexico courts after the military base at issue had been ceded to the federal government. The *Allison* court found that, because it had not been displaced by federal statutory law, New Mexico law as it existed at the time of cession governed the causes of action. The Tenth Circuit had no occasion to assess a choice-of-law clause, as this Court must do here. The dicta about "a choice of law doctrine" meant to communicate simply that, absent any basis dictating otherwise, courts apply the federalized state law of the state in which the federal enclave sits, *i.e.*, the state that ceded its land to the federal government. The existence of a choice-of-law clause, of course, adds an important wrinkle to this Court's analysis.

8

dictates which law applies to causes of action arising on these lands.'" March 2016 Opinion, at

*6 (quoting *Allison*, 689 F.3d at 1235). Proceeding on this principle—that the federal enclave

doctrine operates as a choice-of-law doctrine—the Court explained that "[i]n light of the

Supremacy Clause [of the United States Constitution[8]], only federal law may apply to JAAAT's

claims." March 2016 Opinion, at *7. In essence, the Court concluded that the parties' choice-of-

law provision was invalid because the Supremacy Clause prevented the parties from contracting

around the application of federal law to their breach of contract claims. *See id.* ("The parties'

election [to apply Virginia, not federal law] does not override the Constitution."). Because

federalized state law governed the breach of contract claims at issue, the Court ruled that "only

federal law may apply to JAAAT's claims . . . . , the claims arise under federal law, and subject

matter jurisdiction is appropriate here." March 2016 Opinion, at *7.

 The upshot of the Court's ruling that the parties' choice-of-law provision was invalid and

it had subject-matter jurisdiction over JAAAT's breach of contract claims was the following:

(1) federalized Georgia contract law (*i.e.*, Georgia contract law as of 1917 or 1922) governed the

cause of action that occurred on federal enclaves in Georgia; and, (2) federalized North Carolina

contract law (*i.e.*, North Carolina contract law as of 1919) governed the causes of action that

---

[8] The Supremacy Clause establishes that the Constitution, federal laws, and treaties are
the supreme law of the land, and that federal law prevails in the event of a conflict between
federal law and state law. *See, e.g.*, *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372
(2000) ("A fundamental principle of the Constitution is that Congress has the power to preempt
state law."). The Supremacy Clause provides:

> This Constitution, and the Laws of the United States which shall be made in
> Pursuance thereof; and all Treaties made, or which shall be made, under the
> Authority of the United States, shall be the supreme Law of the Land; and the
> Judges in every State shall be bound thereby, any Thing in the Constitution or
> Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2.

occurred on federal enclaves in North Carolina. (*See* Sept. 26 Mem. O. 5, ECF No. 73.) But the parties did not see it that way.

### E. The Parties' Submissions Relying Only on Current Virginia Law Required this Court to Revisit the Issue of Federal Question Jurisdiction

After the Court found subject-matter jurisdiction through the federal enclave doctrine, Tesoro filed its answer and counterclaims. JAAAT then moved to dismiss Counts 7 through 10 of Tesoro's counterclaims, asserting, *under current Virginia law*, that the causes of action failed to state a claim for which relief can be granted. Tesoro responded, likewise relying *on current Virginia law*. Of course, as discussed, the basis for the Court's finding that it had subject-matter jurisdiction was the Court's conclusion that the parties' choice-of-law provision electing Virginia law was unenforceable, meaning that North Carolina and Georgia federalized state law governed the causes of action in this case. *See* March 2016 Opinion, at *5–7.

Sensing confusion from the parties regarding this novel and complex legal issue, the Court expressed a willingness to "reconsider its earlier holding upon briefing by the parties." (Sept. 26 Mem. O. 5–6, ECF No. 73.) Reminding the parties that "a finding that Virginia law governs the substantive causes of action in this case would necessarily affect this Court's earlier holding that it has subject matter jurisdiction," the Court ordered additional briefing on the basis for this Court to exercise subject-matter jurisdiction over these contract disputes.[9] (*Id.* at 5–6.) The parties submitted additional briefing. (ECF Nos. 76, 79, 85, 86.) The Court, with this additional input from the parties, now reconsiders whether subject-matter jurisdiction exists in this case. It does not.

_____

[9] The Court invited briefing because a case applying only Virginia law would not be one in which federal law *created* the cause of action, nor one in which the right to relief *necessarily depends* on the resolution of a substantial federal question.

## II. Analysis

In federal cases, courts typically address the choice-of-law question—and particularly,

the enforceability of a choice-of-law clause—as a threshold matter. *See Fransmart, LLC*, 768 F.

Supp. 2d at 858 (explaining in a diversity case that "the choice-of-law question is a threshold

issue"); *see also Bunker Holdings, Ltd. v. Green Pacific A/S*, 346 F. App'x 969, 972 (4th

Cir. 2009) (beginning "analysis [in a maritime case] by determining whether the choice-of-law

provisions set forth in the contracts . . . are enforceable"). The March 2016 Opinion ill-advisedly

skipped this preliminary level of analysis. Because needs for predictability and uniformity exist

here with verve, the Court will assess the enforceability of the choice-of-law clause at bar before

addressing other jurisdictional matters.

### A. The Court Should Evaluate the Enforceability of the Choice-of-Law Clause Before Addressing Other Matters

The United States Court of Appeals for the Fourth Circuit indicates that a court should

first evaluate the enforceability of a choice-of-law clause. *See Bunker Holdings, Ltd.*, 346 F.

App'x at 972 (beginning "analysis by determining whether the choice-of-law provisions set forth

in the contracts . . . are enforceable"). Common sense suggests the same. Evaluating the parties'

election to apply the law of their choosing encourages predictability and uniformity. More

specifically, it could promote certainty and consistency in circumstances such as this, where the

same parties are engaged in business across different federal enclaves that would, in the absence

of choice-of-law clauses, involve the application of various federalized state laws.

Of course, to assess enforceability, the Court needs to determine the applicable choice-of-

law rules it should use in order to evaluate enforceability. *See Gulf Ins. Co. v. Davis*, 65 F.3d

166 (4th Cir. 1995) ("The threshold issue that we must resolve is the appropriate choice of law

rule."). Under these odd facts, identifying the law to utilize when undertaking the choice-of-law analysis is, in and of itself, no mean task.

Indeed, determining the applicable choice-of-law rules requires, at a minimum, creative reasoning. Here, we have a case in which a plaintiff invokes federal question jurisdiction, but otherwise claims that state law wholly governs the dispute. The defendant seems to agree with that incongruous procedural and substantive posture. No precedent applying these unique facts exists. Because the parties persist in claiming that federal question jurisdiction exists over what they acknowledge is a contract dispute wholly governed by Virginia state law, the Court undertakes a choice-of-law analysis under what it sees—in a most generous reading—as the three *possible* choice-of-law rules that could apply in this circumstance.

First, the Court could apply federal choice-of-law rules because, even if it did so improperly, JAAAT invoked federal question jurisdiction in the Amended Complaint. Some courts have explained that "[w]here federal question jurisdiction is *invoked*, . . . federal courts generally apply federal common law principles to resolve choice of law disputes." *See, e.g.*, *Nat'l Fair Hous. All., Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46, 62 (D.D.C. 2002) (emphasis added) (citing *Alvarez–Machain v. United States*, 266 F.3d 1045, 1061 (9th Cir. 2001); *A.I. Trade Finance, Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458, 1463–64 (D.C. Cir. 1995)).

Second, the Court conceivably could employ Virginia choice-of-law principles because this Court sits in Virginia or because the parties agreed to apply Virginia law. But the Court sees no basis for applying Virginia choice-of-law rules for either of those reasons. The holding in *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496 (1941), which requires federal courts to apply the choice-of-law rules of the state in which the court sits, pertains only to

those courts exercising *diversity* jurisdiction. Were the Court to apply *Klaxon* here, it would be stuck predicting how the Supreme Court would extend *Klaxon* under the facts of this non-diverse federal matter.[10] Further, it would make little sense to apply the parties' chosen law to determine whether that choice was valid in the first place.

Third, the Court could utilize the federalized state law choice-of-law rules from the states relevant in this contract dispute—the choice-of-law rules in North Carolina and Georgia as they existed at the time the United States acquired those federal enclaves in the early 1900s.[11]

**B. Regardless of the Choice-of-Law Rules Applied, the Parties' Choice-of-Law Clause Likely Would Be Enforceable**

As it turns out, this Court need not reach the issue of which jurisdiction's choice-of-law rules should apply to determine the enforceability of the choice-of-law clause. As the Court will explain below, each inquiry garners the same result: favoring the enforceability of the parties' choice-of-law clause and, consequently, their election to apply Virginia law.

---

[10] Extending *Klaxon*'s holding to this non-diversity case walks a tenuous path perhaps better left untrod. But for the sake of a full analysis, the Court will explore Virginia's choice-of-law rules.

[11] In its Amended Complaint, JAAAT attached numerous exhibits it defined as "Jurisdictional Documents." (*See* Am. Compl. ¶ 12.) These documents purport to establish that the Military Bases are federal enclaves over which the United States has exclusive jurisdiction. (*See* ECF Nos. 16-1 to 16-11.) Specifically, the Jurisdictional Documents indicate that the Military Bases were ceded to the United States on the following dates: Fort Gordon (Georgia)– 1917; Fort Benning (Georgia)–1927; Fort Bragg (North Carolina)–two of the projects are on land acquired on or before 1919, the other project is on land acquired between 1919 and 1940. (*See* Am. Compl. ¶¶ 11–21; ECF Nos. 16-1 to 16-11.)
    This means that, under the federal enclave doctrine, Georgia law as it existed in 1917 would govern the breach of contract claims for work that occurred on Fort Gordon; Georgia law as it existed in 1927 would govern the breach of contract claims for work that occurred on Fort Benning; North Carolina law as it existed on or before 1919 would govern the breach of contract claims for work that occurred on two of the project sites on Fort Bragg; and North Carolina law as it existed between 1919 and 1940 would govern the breach of contract claims for work that occurred on the third project site on Fort Bragg.

13

Unfortunately, such a result then deprives this Court of jurisdiction. The parties' choice-of-law clause seeks to apply Virginia law to all pending causes of action, meaning that this case does not "aris[e] under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Court cannot exercise federal question jurisdiction over the claims before it because federal law would not *create* the causes of action and the parties' relief would not *necessarily depend* on the resolution of a substantial federal question. *See Aegis Def. Servs., LLC*, 141 F. Supp. 3d at 483–84 (citing *Interstate Petroleum Corp.*, 249 F.3d at 219). Because the parties are not diverse, the Court cannot exercise diversity jurisdiction over the claims before it. Thus, for the reasons explained below, the Court will dismiss the action without prejudice for lack of subject-matter jurisdiction.

### 1. The Parties' Choice-of-Law Provision Likely Would Be Enforceable Under Federal Choice-of Law Rules

Were the Court to apply federal choice-of-law rules, the parties' choice-of-law clause would be enforceable and Virginia law would apply. "Federal common law follows the approach of the Restatement (Second) of Conflicts of Laws." *Pyott-Boone Elecs. Inc. v. IRR Trust for Donald L. Fetterolf*, 918 F. Supp. 2d 532, 541 (W.D. Va. 2013) (quoting *Paul Bus. Sys., Inc. v. Canon U.S.A., Inc.*, 397 S.E.2d 804, 807 (Va. 1990)). Under § 187 of the Second Restatement of Conflict of Laws, a choice-of-law provision will not be enforced if either of the following two conditions is satisfied:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue . . . .

Restatement (Second) of Conflict of Laws § 187 (1971). Here, the chosen state—Virginia—certainly has a substantial relationship to the parties, which are both domiciled there. (Am.

Compl. ¶¶ 1, 2.)  For the same reason, a reasonable basis exists for the parties' choice.

Moreover, applying Virginia law would not "be contrary to a fundamental policy" of any other

state that may have an interest in the outcome of this case.  Upon review of the record before the

Court, only North Carolina and Georgia appear to have a relationship to the parties or the

transaction and only because those states serve as the location of the federal enclaves on which

the causes of action arose.  Given that in the absence of a choice-of-law provision, federalized

state law would apply (and not North Carolina or Georgia law), the Court cannot discern how the

application of Virginia law would be contrary to the policies of either North Carolina or Georgia.

Accordingly, under federal choice-of-law rules, the parties' choice-of-law provision likely would

be enforceable, and Virginia law would govern this action.

> **2.     The Parties' Choice-of-Law Provision Likely Would Be Enforceable Under Virginia Choice-of Law Rules**

Were the Court to apply Virginia choice-of-law rules, the parties' choice-of-law clause

would be enforceable and Virginia law would apply.  Federal courts exercising diversity

jurisdiction must apply the choice-of-law rules of the state in which the court is sitting.  *Klaxon*,

313 U.S. at 496.  While no diversity jurisdiction exists here, if the Court extended the *Klaxon*

holding to this non-diverse case, this Court would look to Virginia's choice-of-law rules.[12]

"Virginia courts generally enforce choice-of-law clauses, 'unless the party challenging

enforcement establishes that such provisions are unfair or unreasonable, or are affected by fraud

or unequal bargaining power.'" *Pyott-Boone Elecs. Inc.*, 918 F. Supp. 2d at 541 (quoting *Paul

Bus. Sys., Inc.*, 397 S.E.2d at 807).  Here, neither party challenges the fairness or reasonableness

of the choice-of-law provision, or claims that the choice-of-law provision was affected by fraud

---

[12] No case directs what choice-of-law rules a federal court should apply in a *non*-diverse case involving a choice-of-law clause that directs the application of substantive state law.

or unequal bargaining power.  Thus, if the Court applied Virginia's choice-of-law rules, Virginia law likely would govern this action.

### 3. The Parties' Choice-of-Law Provision Likely Would Be Enforceable Under Either North Carolina or Georgia Choice-of-Law Rules at the Time of Cession

If the Court were to apply the law of the federal enclave on which the contracts were performed to determine whether the parties' choice-of-law provision is enforceable, either North Carolina law at the time of cession or Georgia law at the time of cession would govern the subcontracts.  As discussed earlier, North Carolina law as it existed on or before 1919 would govern the claims for work that occurred on two of the project sites on Fort Bragg, and North Carolina law as it existed between 1919 and 1940 would govern the claims for work that occurred on the third project site on Fort Bragg.  Georgia law as it existed in 1917 would govern the claims for work that occurred on Fort Gordon, and Georgia law as it existed in 1927 would govern the claims for work that occurred on Fort Benning.  Even under those federalized state laws, the parties' choice-of-law provision likely would be enforceable.

### a. The Parties' Choice-of-Law Provision Likely Would Be Enforceable Under North Carolina Choice-of-Law Rules at the Time of Cession

As early as 1907, it was "well settled" in North Carolina that, absent some statute providing otherwise, "the parties may agree upon the place of the contract." *Williams v. Mut. Reserve Fund Life Ass'n*, 58 S.E. 802, 803 (N.C. 1907).  In that timeframe, situations existed in which courts declined to enforce choice-of-law provisions, but the Court sees none analogous to the situation at bar.  Given the "well settled" rule in North Carolina that, absent some statute providing otherwise, "the parties may agree upon the place of the contract," *Williams*, 58 S.E. at 803, and the absence of any of the traditional rules for declining to enforce choice-of-law

provisions, the parties' choice-of-law provision likely would be enforceable under North

Carolina law as it existed on or before 1919 and between 1919 and 1940.[13]

Even a 1906 North Carolina decision refusing to apply the parties' choice-of-law

provision does not countermand such a finding. In *Blackwell v. Mutual Reserve Fund Life*, 53

S.E. 833 (N.C. 1906), a North Carolina resident attempted to recover premiums under a life

insurance contract. The insurance contract provided that "this contract shall be governed by,

subject to, and construed only according to the laws of the state of New York." *Id.* at 835. The

1906 *Blackwell* court found that the contract provision "[wa]s void so far as the courts of [North

Carolina] are concerned" because it left the plaintiff, who "entered into a contract of insurance

with a corporation having no capital or assets within reach of the courts of his state, and with but

little, if any, substantial guaranties of compliance with its contract." *Id.* at 835. The *Blackwell*

court refused to enforce the choice-of-law provision in the contract because it would have left the

North Carolina plaintiff with insufficient redress. *See id.* At most, *Blackwell* instructs that, in

1906, North Carolina courts could refuse to enforce choice-of-law provisions that were contrary

---

[13] The Court finds nothing indicating that North Carolina's preference for applying choice-of-law rules changed between 1919 and 1940. Moreover, cases indicate that North Carolina's approach to choice-of-law provisions remained the same in that time period.
    *Bundy v. Commercial Credit Co.*, 157 S.E. 860, 863 (N.C. 1931), involved a contract for the loan of money to a North Carolina citizen, executed in the state of Maryland, and containing a provision that all aspects of the contract would be controlled by Delaware law, 157 S.E. at 862. The plaintiff argued that the contract was void because the choice-of-law provision was included to avoid the anti-usury laws of North Carolina. *Id.* The Supreme Court of North Carolina ultimately found the contract stipulation as to Delaware law "immaterial" because nothing in the case involved Delaware. *Id.* at 863. *Bundy* thus teaches that, in 1931, North Carolina courts could refuse to honor a choice-of-law provision that applied the law of a state with no connection to the parties or the transaction or occurrence at issue. This exception is consistent with other exceptions to the application of choice-of-law provisions. *See, e.g.*, Restatement (Second) of Conflict of Laws § 187(a) (1971) (stating that a choice-of-law provision will not be honored if "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice"). And the need to refuse to honor a choice-of-law provision would not exist here. Two Virginia companies chose to employ Virginia law, thereby demonstrating a kind of connection absent from the *Bundy* case.

to a fundamental policy of the state, which is consistent with other general exceptions to honoring parties' choice-of-law provisions. *See, e.g.*, Restatement (Second) of Conflict of Laws § 187(b) (1971) (stating that a choice-of-law provision will not be honored if "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue"). *Blackwell* does not, however, suggest that North Carolina courts would have declined to recognize a choice-of-law provision electing to apply Virginia law to a contract dispute involving two Virginia companies. Therefore, if the Court were to apply the federalized state law that governs the three projects on Fort Bragg, the parties' choice-of-law provision likely would be enforceable.

**b.** **The Parties' Choice-of-Law Provision Likely Would Be Enforceable Under Georgia Choice-of-Law Rules at the Time of Cession**

In 1898, the Supreme Court of Georgia stated that Georgia would enforce parties' choice-of-law provisions "so far as that can be done without violating the law of this state or its established policy." *Mass. Ben. Life Ass'n v. Robinson*, 30 S.E. 918, 931 (Ga. 1898) ("Whenever a contract made in a place outside of the territorial jurisdiction of this state is sought to be enforced in this state, courts here will enforce the contract, and give effect to the laws of the place in which it was executed, so far as that can be done without violating the law of this state or its established policy."). The court in *Robinson* held that the parties' choice-of-law provision declaring "that the place of the contract is the city of Boston, and that [the contract] is to be governed and construed only according to the laws of the state of Massachusetts," was enforceable, and because nothing in the contract was "violative either of the law or the public policy of this state, . . . this court will deal with the same as a Massachusetts contract." *Id.*

The Court sees nothing in the parties' contract that is "violative either of the law or the public policy" of Georgia, and nothing indicating that Georgia changed its choice-of-law rules between 1898 and 1917, the date Georgia ceded Fort Gordon to the United States, or 1927, the date Georgia ceded Fort Benning to the United States. Therefore, if the Court were to apply the federalized state law that governs the projects on Fort Gordon and Fort Benning, the parties' choice-of-law provision would be enforceable.

## C.    The Parties' Choice-of-Law Clause is Enforceable Even Though Federalized State Law Would Otherwise Apply

The Court next addresses why it should honor the parties' decision to apply state law to their dispute, even though federalized state law would apply absent their choice-of-law provision. In the context of federal enclaves, this presents a matter of first impression, and the parties have directed the Court to no case law providing otherwise.[14]

Permitting parties to apply the law of their choosing provides certainty and consistency in circumstances such as this, where the same parties are engaged in business across different federal enclaves. The absence of a choice-of-law provision would result in the application of a patchwork of federalized state laws to substantially similar causes of action. The analysis undertaken above, *see supra* Section I.D, plainly demonstrates that the application of federalized

---

[14] Tesoro points to federal maritime law as an analogous context in which parties may elect to apply state law, even in the face of federal law that would otherwise govern the parties' rights. *See, e.g., Dinn v. Hooking Bull Boatyard, Inc.*, No. CIV.A. C-08-309, 2009 WL 2161676, at *3 (S.D. Tex. July 16, 2009) ("Under federal maritime law, 'where the parties have included a choice of law clause, that state's law will govern unless the state has no substantial relationship to the parties or the transaction or the state's law conflicts with the fundamental purposes of maritime law.'" (quoting *Stoot v. Fluor Drilling Services, Inc.*, 851 F.2d 1514, 1517 (5th Cir. 1988)) (citing *Hale v. Co–Mar Offshore Corp.*, 588 F. Supp. 1212, 1215 (D.C. La. 1984); Restatement (Second) of Conflict of Laws § 187(2) (1971)).

Recognizing the *sui generis* nature of federal maritime law, the Court will not extend the maritime rule to a non-maritime context. That said, the Court acknowledges that, even in federal maritime law, where uniformity in the law has long been favored, courts honor choice-of-law provisions.

19

state law, by its very nature, would do anything but assure uniformity because different laws would apply in each federal enclave. Nor would it promote judicial efficiency. Thus, the Court sees no policy basis for rejecting the parties' effort to ensure predictability in their dealings.

### D. Applying Federal Common Law—or Federalized State Law—to Determine the Enforceability of the Choice-of-Law Clause Does Not Confer Federal Question Jurisdiction

Because Virginia law applies to the pending causes of action, this Court lacks federal question jurisdiction. JAAAT, however, suggests that the use of federal common law in the Court's choice-of-law determination necessarily means that this is a federal case for jurisdictional purposes. JAAAT's argument does not persuade.[15]

JAAAT invokes 28 U.S.C. § 1331 as the basis for this Court's jurisdiction. Section 1331 provides: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "[I]n order for federal question jurisdiction to exist[:] (i) federal law must *create* the cause of action[;] or[,] (ii) the plaintiff's right to relief must necessarily depend on the resolution of a substantial federal question." *Aegis Def. Servs., LLC v. Chenega-Patriot Grp., LLC*, 141 F. Supp. 3d 479, 483–84 (E.D. Va. 2015) (emphasis added) (citing *Interstate Petroleum Corp. v. Morgan*, 249 F.3d 215, 219 (4th Cir. 2001)); *see also Interstate Petroleum Corp.*, 249 F.3d at 219 ("Congress has given the lower federal courts jurisdiction to hear 'only those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief

---

[15] Applying federalized state law to determine whether the parties' choice-of-law provision is valid does not confer federal question jurisdiction for the same reasons that applying federal common law to the same determination does not. Federal question jurisdiction turns on the substantive law a court applies to decide a party's claims. *See, e.g., Aegis Def. Servs., LLC*, 141 F. Supp. 3d at 484. Because the Court would apply federalized state law only to make the threshold choice-of-law determination, *Fransmart, LLC*, 768 F. Supp. 2d at 858, that is insufficient to confer federal question jurisdiction.

necessarily depends on resolution of a substantial question of federal law.'" (quoting *Franchise Tax Bd. v. Const. Laborers Vacation Trust*, 463 U.S. 1, 27 (1983))).

Because the parties' choice-of-law provision is enforceable, Virginia law governs the claims at bar. As such, the pertinent causes of action were necessarily created under the law of Virginia, not federal law. A complaint that asserts "causes of action that are exclusively state law claims" does not depend on federal law. *See Aegis Def. Servs., LLC*, 141 F. Supp. 3d at 484. "This alone is typically sufficient" to preclude the exercise of federal question jurisdiction. *Id.* Also, the right to relief under Virginia contract claims does not depend on the resolution of a substantial question of federal law because "the right to relief [does not depend] upon the construction or application of the Constitution or laws of the United States." *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 199 (1921). JAAAT does not argue otherwise. *See, e.g.*, *Int'l Longshoremen's Ass'n v. Va. Int'l Terminals, Inc.*, 914 F. Supp. 1335, 1338 (E.D. Va. 1996) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)).

Thus, because the parties' choice-of-law clause, which provides that Virginia law applies to any contract disputes, is enforceable, Virginia law applies to JAAAT's breach of contract claims. As a consequence, the suit necessarily "aris[es] under" Virginia law, not federal law, *see Interstate Petroleum Corp.*, 249 F.3d at 222 ("The cause of action in this case was created under the law of West Virginia, so the suit arises under that law, not federal law."), and the Court lacks subject-matter jurisdiction over the claims.[16]

The Court will vacate the March 2016 Opinion and accompanying order, and dismiss this case for lack of subject-matter jurisdiction.

---

[16] The Court obviously lacks diversity jurisdiction because the parties are both domiciled, for the purpose diversity jurisdiction, in Virginia.

### III. Conclusion

For the foregoing reasons, the Court will vacate the March 2016 Opinion and the accompanying order, (ECF Nos. 32, 33), and will dismiss, without prejudice, this case for lack of subject-matter jurisdiction. The Court will deny as moot the following outstanding motions: (1) JAAAT's Motion to Quash Subpoena *Duces Tecum*, (ECF No. 70); (2) Tesoro's Motion to Compel, (ECF No. 71); and, (3) Tesoro's Motion to Strike Testimony of Eddie Cummings, (ECF No. 77).

An appropriate Order shall issue.

/s/

M. Hannah Lauck
United States District Judge

Richmond, Virginia
Date: 9/11/17